1  Mona Amini, Esq.
   Nevada Bar No. 15381
2  **KAZEROUNI LAW GROUP, APC**
   6940 S. Cimarron Road, Suite 210
3  Las Vegas, Nevada 89113
   Telephone: (800) 400-6808
4  Facsimile:  (800) 520-5523
   E-mail: mona@kazlg.com
5
   Tyler J. Bean *
6  Sonjay C. Singh *
   SIRI & GLIMSTAD LLP
7  745 Fifth Avenue, Suite 500
   New York, New York 10151
8  Telephone: (212) 532-1091
   Email: tbean@sirillp.com
9  Email: ssingh@sirillp.com

10 *Attorneys for Plaintiffs,*
   N.O. and H.H.

11              **UNITED STATES DISTRICT COURT**

12                 **DISTRICT OF NEVADA**

13 **N.O.** and **H.H.**, on behalf of themselves and all      Case No.:
   others similarly situated,
14
                      Plaintiffs,                    **CLASS ACTION COMPLAINT**
15
16              vs.

17 **MAYNE PHARMA COMMERCIAL LLC,**                  **JURY TRIAL DEMANDED**
   **THERAPEUTICSMD, INC., DPT**
18 **LABORATORIES, LTD.**, and **MITHRA**
   **PHARMACEUTICALS SA,**
19
                      Defendants.
20
21
22

23       Plaintiffs N.O. and H.H. (collectively, "Plaintiffs"), individually and on behalf of all

24 similarly situated persons, allege the following against Defendants Mayne Pharma Commercial

25 LLC ("Mayne"), TherapeuticsMD, Inc. ("TherapeuticsMD"), DPT Laboratories, Ltd. ("DPT"), and

26 Mithra Pharmaceuticals SA ("Mithra", and collectively, "Defendants") based upon personal

27 knowledge with respect to themselves and on information and belief derived from, among other

28 things, investigation by their counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2.    The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3.    Mayne is a global pharmaceutical company with a 40-year track record of commercializing novel pharmaceutics, particularly in the areas of women's health and dermatology. Mayne employes over 400 employees around the world and reported AUD 408.1 million in total revenue for the 2025 fiscal year.

4.    Mayne markets, manufactures, and/or is granted license to manufacture and/or market various pharmaceutical products. As part of its pharmaceutical business, Mayne maintains consumer-directed marketing websites for various pharmaceutical products, including the following medications prescribed to Plaintiffs:

| **Brand Name** | **Pharmaceutical Product** | **Manufacturer** | **Website** |
|---|---|---|---|
| Annovera | a vaginal birth control ring that releases hormones to prevent pregnancy | TherapeuticsMD | https://www.annovera.com/ (the "Annovera Website") |
| Bijuva | a prescription medication that combines estradiol and progesterone, two hormones used to treat moderate to severe hot flashes and other symptoms of menopause | TherapeuticsMD | https://www.bijuva.com/ (the "Bijuva Website") |
| Doryx | a tetracycline antibiotic used to treat various bacterial infections, including acne, urinary tract infections, intestinal infections, and more. | Mayne | https://doryx.com/ (the "Doryx Website") |

CLASS ACTION COMPLAINT

| | Imvexxy | a prescription menopause medication administered as vaginal inserts to deliver estrogen directly to the vaginal area to alleviate symptoms associated with vaginal atrophy | TherapeuticsMD | https://www.imvexxy.com/ (the "Imvexxy Website") |
|---|---|---|---|---|
| | Rhofade | a topical cream used to treat persistent facial redness associated with rosacea | DPT | https://www.rhofade.com/ (the "Rhofade Website") |
| | Sorilux | a topical treatment that contains calcipotriene, a man-made form of vitamin D, primarily used to treat plaque psoriasis | Mayne | www.soriluxfoam.com (the "Sorilux Website") |
| | Nextstellis | a prescription combination oral birth control pill used for the prevention of pregnancy | Mithra | www.nextstellis.com (the "Nextstellis Website") |
| | Fabior | a topical prescription medication used to treat moderate-to-severe acne in people 12 years and older | Mayne | www.fabior.com (the "Fabior Website") |
| | Lexette | a topical corticosteroid used primarily for the treatment of plaque psoriasis in patients aged 12 years and older | Mayne | lexette.com (the "Lexette Website") |

Hereinafter, these consumer-directed pharmaceutical marketing websites are referred to collectively as the "Pharmaceutical Websites."

5.     Through the Pharmaceutical Websites, patients can obtain information about Defendants' pharmaceutical products and apply for and receive vouchers for discounts on Defendants' pharmaceuticals ("Saving Cards").[1] Each of the Plaintiffs used a Pharmaceutical Website for some or all of these purposes, as described more fully below.

6.     Unfortunately, unbeknownst to Plaintiffs and other visitors to the Pharmaceutical Websites, Defendants do not keep their patients' private personal and health information

---

[1] See Pharmaceutical Websites, at ¶ 4, supra.

3

confidential. Instead, through the Pharmaceutical Websites, Defendants collected and transmitted personally identifiable and sensitive health information pertaining to Plaintiffs' medical conditions, prescriptions and medical expenses (collectively, the "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google") and Meta Platforms, Inc. ("Facebook," and together with Google, the "Tracking Tool Providers"), through the use of surreptitious online tracking tools without Plaintiffs' or Class Members' consent.

7.      Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If, for example, the Tracking Tool Providers receive information that a person is diabetic, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones for products and services related to diabetes management.

8.      The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products; and Facebook's *Meta Business Suite* and *Facebook Ads* products (collectively, the "Business Tools"). By using any of the Tracking Tool Providers' Business Tools, website operators can leverage the Tracking Tool Providers' enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

9.      The Tracking Tool Providers' massive databases of consumer information can only exist with the help of users of the Business Tools, like Defendants. To use any of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Providers' internet

CLASS ACTION COMPLAINT

user surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools"). In other words, if a website operator wishes to use, e.g., Google Analytics, it must install Google's Tracking Tools onto its website. After being installed, the Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer. Moreover, this sensitive information often includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.

10.    In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

11.    Defendants are companies that choose to prioritize their marketing efforts and profits over their patients' privacy by installing the Tracking Tools on their websites. Each of the Plaintiffs and Class Members used a Pharmaceutical Website and had their personal Sensitive Health Information tracked by Defendants using the Tracking Tools. However, Defendants **never** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. Therefore, at all relevant times, Plaintiffs and Class Members could not, and did not, provide informed consent for their Sensitive Health Information to be transmitted to the third parties, including to the largest advertisers and compilers of personal information in the world.

12.    Numerous commentators have raised alarm at these practices. A full decade ago, in 2015, Politico published a report exposing how drug companies like Defendants collect consumer medical data through price discount programs without their knowledge, sometimes even collecting

CLASS ACTION COMPLAINT

the entirety of a patient's medical records.[2] As scrutiny of such practices increased, the FTC took action in a similar case against GoodRX Holdings, Inc. due to its practice of collecting medical data on-line from customers of its prescription drug discount program.[3] Yet, despite over a decade of public outcry, Defendants continue to collect and disclose the Sensitive Health Information of users of the Pharmaceutical Websites to unauthorized third parties.

13.    Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[4] Accordingly, Defendants' disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

14.    As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

---

[2] *See* Darius Tahir, *Big Pharma gets data for discounts*, POLITICO (Dec. 22, 2015), https://www.politico.com/story/2015/12/drug-companies-data-for-discounts-217080 (last visited Dec. 2, 2025).
[3] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising*, FEDERAL TRADE COMMISSION (Feb 1, 2024), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising (last visited Dec. 2, 2025).
[4] 18 U.S.C. § 1320d-(6).

15.     Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; and violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.

## II.     PARTIES

### *Plaintiff N.O.*

16.     Plaintiff N.O. is a citizen of the State of Connecticut, residing in Fairfield County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17.     To treat Plaintiff N.O.'s acne, Plaintiff N.O.'s physician prescribed Doryx, a medication produced, marketed and sold by Defendant Mayne.

18.     In or around May of 2025, Plaintiff N.O. visited the Doryx Website to obtain information regarding Doryx and to obtain a Savings Card.

19.     Unbeknownst to Plaintiff N.O., the Doryx Website transmitted her Sensitive Health Information—including the fact that she enrolled in the Doryx savings program and her specific medical condition—to unauthorized third parties through the Tracking Tools.

20.     Plaintiff N.O. never authorized Defendants to disclose any aspect of her communications with Defendants through the Doryx Website to third parties, including the Sensitive Health Information that she provided through the Doryx Website.

21.     On every occasion that she visited the Doryx Website, Plaintiff N.O. possessed accounts with Google and Facebook, and she accessed the Afrezza Website while logged into her Google and Facebook accounts on the same device.

22.     After providing her Sensitive Health Information to Defendant Mayne through the Doryx Website, Plaintiff N.O. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff H.H.***

23.     Plaintiff H.H. is a citizen of the State of Florida, residing in Broward County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

24.     Plaintiff H.H. suffers from vaginal atrophy as a result of menopause. To treat this condition, Plaintiff H.H.'s physician prescribed her Imvexxy, a medication produced, marketed and sold by Defendants Mayne and TherapeuticsMD.

25.     In or around May of 2025, Plaintiff H.H. visited the Imvexxy Website to obtain information regarding Imvexxy, and to obtain a Savings Card.

26.     Unbeknownst to Plaintiff H.H., the Imvexxy Website transmitted her Sensitive Health Information—including the fact that she was prescribed Imvexxy, had applied for and downloaded a Imvexxy Savings Card and her specific medical condition—to unauthorized third parties through the Tracking Tools.

27.     Plaintiff H.H. never authorized Defendants to disclose any aspect of her communications with Defendants through the Imvexxy Website to third parties, including the Sensitive Health Information that she provided through the Imvexxy Website.

28.     On every occasion that she visited the Imvexxy Website, Plaintiff H.H. possessed accounts with Google and Facebook, and she accessed the Imvexxy Website while logged into her Google and Facebook accounts on the same device.

29.     After providing her Sensitive Health Information to Defendants through the Website, Plaintiff H.H. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Defendant Mayne***

30.     Mayne Pharma Commercial LLC is a limited liability corporation incorporated in the State of North Carolina, with its principal place of business located at 3301 Benson Drive, Suite

401, Raleigh, North Carolina in Wake County.

***Defendant TherapeuticsMD***

31.     TherapeuticsMD, Inc. is a for-profit corporation incorporated in the State of Nevada, with its principal place of business located at 4233 W. Hillsboro Blvd., #970938, Coconut Creek, Florida, in Broward County.

***Defendant DPT***

32.     DPT Laboratories, Ltd. is a limited company incorporated in the State of Texas, with its principal place of business located at 307 E. Josephine St., San Antonio, Texas, in Bexar County.

***Defendant Mithra***

33.     Mithra Pharmaceuticals SA is a public company incorporated in Belgium, with its principal place of business located at Rue De L'Expansion 57, Flemalle, Liege, 4400.

## III.    JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendants. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

35.     This Court has personal jurisdiction over Defendants because Defendant TherapeuticsMD is incorporated in the state of Nevada, and Defendants have otherwise made or established contacts in the State of Nevada and in this judicial district sufficient to permit the exercise of personal jurisdiction.

CLASS ACTION COMPLAINT

36.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i.    The Tracking Tool Providers Mass Advertising Surveillance Operations

37.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[5] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[6]

38.     Google advertises Google Analytics and other Business Tools to website operators, like Defendants, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[7] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[8]

39.     Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[9]

---

[5] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Dec. 2, 2025).

[6] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Dec. 2, 2025).

[7] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Dec. 2, 2025).

[8] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Dec. 2, 2025).

40.     Google also admits that it uses the information collected from third party websites, such as Defendants', to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[10]

41.     Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[11]

42.     Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[12]

43.     But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendants, and uses that information to sell targeted advertising.[13] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[14]

44.     While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available

---

[9] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Dec. 2, 2025).

[10] *Id.*

[11] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Dec. 2, 2025).

[12] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last visited Dec. 2, 2025).

[13] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last visited Dec. 2, 2025).

[14] *Id.*

CLASS ACTION COMPLAINT

list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of the Tracking Tool Providers' data collection practices referenced above could not given Plaintiffs and Class Members any reason to think that Defendants were part of the Tracking Tool Providers' surveillance networks. Moreover, as Defendants do not disclose their use of the Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of the Tracking Tool Providers privacy statements in connection with their use of the Pharmaceutical Websites.

45.     The Tracking Tool Providers aggregate the user information that they collect from third-party websites into "advertising profiles" consisting of all of the data that they have collected about a given user.[15] With these advertising profiles, the Tracking Tool Providers can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[16]

46.     The surveillance of individuals' internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[17] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[18]

---

[15] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[16] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Dec. 2, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last visited Dec. 2, 2025).

[17] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Dec. 2, 2025).

[18] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last visited Dec. 2, 2025).

47.     Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

    a.  93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[19] In fact, Google advertising trackers were found on 73-percent of pornography websites.[20]

    b.  81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[21]

    c.  Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[22] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[23]

    d.  Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[24]

48.     This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[25] Likewise, in

---

[19] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[20] *Id.*

[21] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[22] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Dec. 2, 2025).

[23] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Dec. 2, 2025).

[24] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last visited Dec. 2, 2025).

[25] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Dec. 2, 2025).

CLASS ACTION COMPLAINT

2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[26]

49.    In fact, the Tracking Tool Providers value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[27]

50.    When website operators, like Defendants, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[28] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[29]

51.    In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[30] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[31]

---

[26] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last visited Dec. 2, 2025).

[27] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Dec. 2, 2025) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last visited Dec. 2, 2025) ("Meta Business Suite is a free tool").

[28] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Dec. 2, 2025).

[29] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Dec. 2, 2025).

[30] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

CLASS ACTION COMPLAINT

52.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[32]

### ii.    Pixels Can Record Almost Every Interaction Between a User and a Website

53.    In order to use the Tracking Tool Providers' Business Tools, Defendants installed the Tracking Tools, including tracking Pixels, onto the Pharmaceutical Websites.

54.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[33]

55.    Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[34]

---

[31] *Id*.

[32] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[33] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Dec. 2, 2025).

[34] *See id*.; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Dec. 2, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Dec. 2, 2025).

CLASS ACTION COMPLAINT

56.    But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[35]

### iii.    The Pixels Installed on the Pharmaceutical Websites Transmit Personally Identifiable Information to the Tracking Tool Providers.

57.    Every website is hosted by a computer "server" that holds the website's contents.

58.    To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

59.    Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

60.    Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[36] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[37] For example, in a more innocuous use case, a cookie

---

[35] *Lurking Beneath the Surface, supra* note 33.

[36] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Dec. 2, 2025).

[37] *Id.*

CLASS ACTION COMPLAINT

may allow the website to remember a user's name and password, language settings, or shopping cart contents.[38]

61.    When a Tracking Tool Provider accountholder logs onto their account, their web browser records a tracking cookie.[39] These cookies include a specific line of code that links the web browser to the user's account with the Tracking Tool Provider.[40]

62.    The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies.  Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user.  The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

63.    Simultaneously, the Pixels, like those installed on the Pharmaceutical Websites, request identifying information from any of the Tracking Tool Provider' cookies previously installed on the user's web browser.

64.    The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to the Tracking Tool Providers. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Pharmaceutical Websites to the user's identity, via the user's account or profile.  Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

65.    A remarkable number of Americans possess a Google or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[41] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of

---

[38] *Id*.

[39] Cyphers & Gebhart, *supra* note 15.

[40] *Id*.

[41] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited Dec. 2, 2025).

CLASS ACTION COMPLAINT

Americans use YouTube, Google's video client.[42] When these users visit a website, like the Pharmaceutical Websites, that utilizes the Tracking Tool Providers' Tracking Tools, any information collected by the Pixels can be linked to the user's identity through the relevant cookies installed on the user's web browser.

66.    However, it is not only accountholders of the Tracking Tool Providers that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have an account.

67.    The Tracking Tools, like those on the Pharmaceutical Websites, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

68.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[43] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[44] And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### iv.    Defendants Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Unauthorized Third Parties.

69.    To download pharmaceutical Savings Cards and receive information about their prescribed drugs, Plaintiffs and Class Members were required to use the Pharmaceutical Websites.

---

[42] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Dec. 2, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Dec. 2, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Dec. 2, 2025).

[43] Cyphers & Gebhart, *supra* note 15.

[44] *Id.*

CLASS ACTION COMPLAINT

70.     Unbeknownst to Plaintiffs and Class Members, Defendants intentionally configured the Tracking Tools installed on the Pharmaceutical Websites to capture and transmit the Sensitive Health Information that they communicated to Defendants while accessing medical information and applying for or accessing prescription Saving Cards to unauthorized third parties, including the Tracking Tool Providers. The information provided in the following Figures is exemplar information collected on the Pharmaceutical Websites, and are not Plaintiffs' information, but the Tracking Tools installed on the Pharmaceutical Websites collected the same or similar information about Plaintiffs and Class Members.

***Annovera Website***

71.     The following screenshots ("Figures 1-2") depict network transmissions made to Google by the Tracking Tools installed on the Annovera Website. As Figures 1-2 show, when patients navigate the Annovera Website for more information about Annovera or request a Savings Card through the Annovera Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Annovera Website includes the fact that the patient is prescribed Annovera and the fact that the patient enrolled in the Annovera patient savings program. Because Annovera is a known contraceptive, the fact that a patient has been prescribed Annovera necessarily reveals sensitive information about the patient's efforts to prevent pregnancy.

CLASS ACTION COMPLAINT

```
          Protocol: https
              Host: analytics.google.com
              Path: /g/collect
    PARAMETERS
                 v: 2
               tid: G-QDEW3PMSPB
               gtm: 45je5810v9105027775z89168230533za200
                _p: 1756153107643
               gcd: 131313131111
               npa: 0
               dma: 0
           tag_exp: 101509157-103116026-103200004-103233427-104527907-104528500-104684208-104684211-104948813-105102051-1053
                    30666-105399921-105399923
               cid: 1993366067.1756152824
                ul: en-us
                sr: 2560x1440
               uaa: x86
               uab: 64
             uafvl: Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128
              uamb: 0
               uam:
               uap: Windows
              uapv: 19.0.0
               uaw: 0
               are: 1
               frm: 0
             pscdl: noapi
               _eu: AAAAAAQ
                _s: 2
               sid: 1756152823
               sct: 1
               seg: 1
                dl: https://www.annovera.com/savings-information/?utm_medium=&utm_source=&utm_campaign=&utm_term=&utm_conten
                    t=
                dr: https://www.annovera.com/
                dt: ANNOVERA® Cost & Savings Information
                en: Click to Exit
    ep.Click_Text: HOW DO I GET IT?
     ep.Click_URL: https://www.annovera.com/how-do-i-get-it?utm_medium=&utm_source=&utm_campaign=&utm_term=&utm_content=
     ep.Page_Path: /savings-information/
      ep.Page_url: https://www.annovera.com/savings-information/?utm_medium=&utm_source=&utm_campaign=&utm_term=&utm_conten
                    t=
               _et: 83
               tfd: 8099
```

CLASS ACTION COMPLAINT

```
Protocol: https
    Host: analytics.google.com
    Path: /g/collect
PARAMETERS
        v: 2
      tid: G-QDEW3PMSPB
      gtm: 45je5810v9105027775za200
       _p: 1756153107643
      gcd: 131313131111
      npa: 0
      dma: 0
  tag_exp: 101509157-103116026-103200004-103233427-104527907-104528500-104684208-104684211-104948813-105102051-105330666
           -105399921-105399923
      cid: 1993366067.1756152824
       ul: en-us
       sr: 2560x1440
      uaa: x86
      uab: 64
    uafvl: Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128
     uamb: 0
      uam:
      uap: Windows
     uapv: 19.0.0
      uaw: 0
      are: 1
      frm: 0
    pscdl: noapi
      _eu: AAAAAAQ
       _s: 3
      sid: 1756152823
      sct: 1
      seg: 1
       dl: https://www.annovera.com/savings-information/?utm_medium=&utm_source=&utm_campaign=&utm_term=&utm_content=
       dr: https://www.annovera.com/
       dt: ANNOVERA® Cost & Savings Information
       en: user_engagement
      _et: 2193
      tfd: 8099
```

*Figures 1-2. Exemplar screenshots depicting back-end network traffic from the Annovera Website which shows information transmitted to Google when patients navigate the Annovera Website and request a Savings Card.*

72.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figures 1-2 show that the Google Tracking Tools on the Annovera Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region, operating system and version number, web browser and version number, and language.

73.    Additionally, Tracking Tools produced by Facebook and Microsoft are also present on the Annovera Website.

CLASS ACTION COMPLAINT

*Bijuva Website*

74.    The following screenshots ("Figures 3-4") depict network transmissions made to Google by the Tracking Tools installed on the Bijuva Website. As Figures 3-4 show, when patients get more information about Bijuva and request a Savings Card through the Bijuva Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Bijuva Website includes the fact that the patient is prescribed Bijuva and the fact that the patient downloaded a Bijuva Savings Card. Because Bijuva is specifically prescribed to treat hot flashes associated with menopause, the fact that a patient has been prescribed Bijuva necessarily reveals that they are experiencing menopause.

CLASS ACTION COMPLAINT

*Figures 3-4. Exemplar screenshots depicting back-end network traffic from the Bijuva Website which shows information transmitted to Google when patients download a Savings Card.*

75.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figures 3-4 show that the Google Tracking Tools on the Bijuva Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account and that the Tracking Tools additionally transmitted information commonly used to make a browser fingerprint, including the user's device information and language.

23

CLASS ACTION COMPLAINT

1    *Doryx Website*

2        76.    The following screenshot ("Figures 5") depicts network transmissions made to

3    Google by the Tracking Tools installed on the Doryx Website. As Figure 5 shows, when patients

4    request a Savings Card through the Doryx Website, the Sensitive Health Information requested and

5    contemporaneously transmitted to Google by the Tracking Tools installed on the Doryx Website

6    includes the fact that the patient is prescribed Doryx, and the fact that the patient downloaded a

7    Doryx Savings Card. Because Doryx is specifically prescribed to treat various bacterial infections,

8    the fact that a patient has been prescribed Doryx necessarily reveals that they suffer from a bacterial

9    infection.

10

**CLASS ACTION COMPLAINT**

*Figure 5. Exemplar screenshot depicting back-end network traffic from the Doryx Website which shows information transmitted to Google when patients request a Savings Card.*

77.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff N.O. and Class Members to their identities. Figure 5 shows that the Google Tracking Tools on the Doryx Website transmitted the identifier numbers attached to Google's 'cid' and 'sid cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

***Imvexxy Website***

78.     The following screenshot ("Figure 6") depicts network transmissions made to Google by the Tracking Tools installed on the Imvexxy Website. As Figure 6 shows, when patients request a Savings Card through the Imvexxy Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Imvexxy Website includes the fact that the patient is prescribed Imvexxy, and the fact that the patient downloaded an Imvexxy Savings Card. Because Imvexxy is specifically prescribed to treat vaginal atrophy primarily associated with menopause, the fact that a patient has been prescribed Imvexxy necessarily reveals that they suffer from vaginal atrophy likely linked to menopause.

CLASS ACTION COMPLAINT

| Parameter | Value |
|---|---|
| v | 2 |
| tid | G-JKZ70E30JL |
| gtm | 45je580v894720370za200zb79642329zd79642329 |
| _p | 1756153416125 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~105399921~105399923 |
| cid | 20376246.1756153412 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AEAAAAQ |
| _s | 3 |
| sid | 1756153411 |
| sct | 1 |
| seg | 1 |
| dl | https://www.imvexxyhcp.com/request-samples/ |
| dr | https://www.imvexxyhcp.com/ |
| dt | IMVEXXY® (estradiol vaginal inserts) – Samples and Savings |
| _tu | wAQ |
| en | file_download |
| ep.link_id | |
| ep.link_url | https://www.imvexxyhcp.com/Imvexxy%20Copay%20Card%202024.pdf |
| ep.link_text | DOWNLOAD SAVINGS CARD |
| ep.file_name | /Imvexxy%20Copay%20Card%202024.pdf |
| ep.file_extension | pdf |
| _et | 1 |
| tfd | 17274 |

*Figure 6. Exemplar screenshot depicting back-end network traffic from the Imvexxy Website which shows information transmitted to Google when patients request a Savings Card.*

79.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff H.H. and Class Members to their identities. Figure 6 shows that the Google Tracking Tools on the Imvexxy Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

26
CLASS ACTION COMPLAINT

80.     Additionally, Tracking Tools produced by Facebook, Xandr (f/k/a AppNexus), Teads, and Hotjar are also present on the Imvexxy Website.

***Rhofade Website***

81.     The following screenshot ("Figure 7") depicts network transmissions made to Google by the Tracking Tools installed on the Rhofade Website. As Figure 7 shows, when patients request a Savings Card through the Rhofade Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Rhofade Website includes the fact that the patient is prescribed Rhofade, and the fact that the patient downloaded a Rhofade Savings Card. Because Rhofade is primarily prescribed to treat redness associated with rosacea, the fact that a patient has been prescribed Rhofade is indicative that the patient likely experiences symptoms of rosacea.

CLASS ACTION COMPLAINT

| | |
|---|---|
| ✕  Headers  **Payload**  Preview  Response  Initiator  Timing | |
| ▼ Query String Parameters  [View source]  [View URL-encoded] | |
| v | 2 |
| tid | G-GLWRZNYJW9 |
| gtm | 45je58l0v9171080341za200zd9171080341 |
| _p | 1756154248927 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~105102052~105399921~105399923~105423368 |
| cid | 352626837.1756154141 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AEAAAAQ |
| _s | 3 |
| sid | 1756154140 |
| sct | 1 |
| seg | 1 |
| dl | https://rhofade.com/consult-a-dermatologist |
| dr | https://rhofade.com/about-rhofade.php |
| dt | RHOFADE® (oxymetazoline HCl) Cream, 1% | Consult a Dermatologist | RHOFADE® (oxymetazoline HCl) Cream, 1% |
| en | file_download |
| ep.link_id | btnSavings |
| ep.link_url | https://rhofade.com/_assets/pdf/Mayne_DERM_Copay_Card.pdf |
| ep.link_text | DOWNLOAD SAVINGS CARD |
| ep.file_name | /_assets/pdf/Mayne_DERM_Copay_Card.pdf |
| ep.file_extension | pdf |
| _et | 16418 |
| tfd | 36896 |

*Figure 7. Exemplar screenshot depicting back-end network traffic from the Rhofade Website which shows information transmitted to Google when patients request a Savings Card.*

82.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figure 7 shows that the Google Tracking Tools on the Rhofade Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google

28

CLASS ACTION COMPLAINT

account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

***Sorilux Website***

83.    The following screenshot ("Figure 8") depicts network transmissions made to Google by the Tracking Tools installed on the Sorilux Website. As Figure 8 shows, when patients request a Savings Card through the Sorilux Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Sorilux Website includes the fact that the patient is prescribed Sorilux, and the fact that the patient downloaded a Sorilux Savings Card. Because Sorilux is specifically prescribed to treat plaque psoriasis, the fact that a patient has been prescribed Sorilux necessarily reveals that they suffer from plaque psoriasis.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



*Figure 8. Exemplar screenshot depicting back-end network traffic from the Sorilux Website which shows information transmitted to Google when patients request a Savings Card.*

84.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figure 8 shows that the Google Tracking Tools on the Sorilux Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

30
CLASS ACTION COMPLAINT

*Nextstellis Website*

85.     The following screenshots ("Figures 9-10") depict network transmissions made to Google and Facebook by the Tracking Tools installed on the Nextstellis Website. As Figures 9-10 show, when patients request a Savings Card through the Nextstellis Website, the Sensitive Health Information requested and contemporaneously transmitted to Google and Facebook by the Tracking Tools installed on the Nextstellis Website includes the fact that the patient is prescribed Nextstellis, and the fact that the patient downloaded an Nextstellis Savings Card. Because Nextstellis is a known contraceptive, the fact that a patient has been prescribed Nextstellis necessarily reveals sensitive information about the patient's efforts to prevent pregnancy.

CLASS ACTION COMPLAINT



| Query String Parameters | | |
|---|---|---|
| v | 2 | |
| tid | G-F15NFQCFZ2 | |
| gtm | 45je58l0h1v882851036za200zb842424013zd842424013 | |
| _p | 1756153739739 | |
| gcd | 13l3l3l3l1l1 | |
| npa | 0 | |
| dma | 0 | |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~1053999 21~105399923~105423836 | |
| cid | 1058069749.1756153649 | |
| ul | en-us | |
| sr | 2560x1440 | |
| uaa | x86 | |
| uab | 64 | |
| uafvl | Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128 | |
| uamb | 0 | |
| uam | | |
| uap | Windows | |
| uapv | 19.0.0 | |
| uaw | 0 | |
| are | 1 | |
| frm | 0 | |
| pscdl | noapi | |
| _eu | AEAAAAQ | |
| _s | 2 | |
| sid | 1756153648 | |
| sct | 1 | |
| seg | 1 | |
| dl | https://www.nextstellis.com/ | |
| dr | https://www.maynepharma.com/ | |
| dt | Get to know NEXTSTELLIS® (drospirenone and estetrol tablets) | |
| _tu | 4AQ | |
| en | file_download | |
| ep.link_id | | |
| ep.link_url | https://www.nextstellis.com/Mayne%202025%20Nextstellis%20Copay.pdf?utm_medium=&utm_source=&utm_campaign= &utm_term=&utm_content= | |
| ep.link_text | Download my savings card | |
| ep.file_name | /Mayne%202025%20Nextstellis%20Copay.pdf | |
| ep.file_extension | pdf | |
| _et | 2228 | |
| tfd | 18446 | |

CLASS ACTION COMPLAINT

*Figures 9-10. Exemplar screenshots depicting back-end network traffic from the Nextstellis Website which shows information transmitted to Google and Facebook when patients request a Savings Card.*

86.    Further, the information that was transmitted to Google and Facebook was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figures 9-10 show that the Tracking Tools on the Nextstellis Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies and Facebook's 'fbp' cookie, which identify the user's Google and Facebook accounts respectively, as well as information commonly used to make a browser fingerprint, including the user's region and language.

CLASS ACTION COMPLAINT

1  *Fabior Website*

2    87. The following screenshot ("Figure 11") depicts network transmissions made to

3  Google by the Tracking Tools installed on the Fabior Website. As Figure 11 shows, when patients

4  request a Savings Card through the Fabior Website, the Sensitive Health Information requested and

5  contemporaneously transmitted to Google by the Tracking Tools installed on the Fabior Website

6  includes the fact that the patient is prescribed Fabior, and the fact that the patient downloaded a

7  Fabior Savings Card. Because Fabior is specifically prescribed to treat moderate-to-severe acne, the

8  fact that a patient has been prescribed Fabior necessarily reveals that they suffer from acne.



*Figure 11. Exemplar screenshot depicting back-end network traffic from the Fabior Website which shows information transmitted to Google when patients request a Savings Card.*

CLASS ACTION COMPLAINT

88.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figure 11 shows that the Google Tracking Tools on the Fabior Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

***Lexette Website***

89.    The following screenshot ("Figure 12") depicts network transmissions made to Google by the Tracking Tools installed on the Lexette Website. As Figure 12 shows, when patients request a Savings Card through the Lexette Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Lexette Website includes the fact that the patient is prescribed Lexette, and the fact that the patient downloaded a Lexette Savings Card. Because Lexette is specifically prescribed to treat plaque psoriasis, the fact that a patient has been prescribed Lexette necessarily reveals that they suffer from plaque psoriasis.

CLASS ACTION COMPLAINT

| | |
|---|---|
| v | 2 |
| tid | G-303BJZYZS7 |
| gtm | 45je580v9126533074za200 |
| _p | 1756154085928 |
| gcd | 13l3l3l3l2l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~1051020 52~105399921~105399923~105423836 |
| ul | en-us |
| sr | 2560x1440 |
| cid | 460894276.1756154054 |
| ir | 1 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0|Microsoft%20Edge;139.0.3405.102|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | EBAIAAQ |
| _s | 2 |
| dl | https://www.lexette.com/hcp/savings-resources |
| dt | Savings & Resources | Lexette® Foam (halobetasol propionate) |
| sid | 1756154053 |
| sct | 1 |
| seg | 1 |
| _tu | wAQ |
| en | pdf - download button |
| _ee | 1 |
| ep.event_category | /hcp/savings-resources |
| ep.event_label | https://www.lexette.com/sites/default/files/inline-images/hcp/Dear_Pharmacist_Letter.pdf |
| _et | 3674 |
| tfd | 10967 |

*Figure 12. Exemplar screenshot depicting back-end network traffic from the Lexette Website which shows information transmitted to Google when patients request a Savings Card.*

90.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. Figure 8 shows that the Google Tracking Tools on the Lexette Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

CLASS ACTION COMPLAINT

91.    In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage. Defendants purposely configured the Tracking Tools on the Pharmaceutical Websites to collect and transmit additional user data, including the specific actions that Plaintiffs and Class Members took while applying for Savings Cards, their medical diagnoses, and their prescription statuses.

**B.    DEFENDANTS DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

**i.    Defendants failed to inform Plaintiffs and Class Members of their disclosure of Plaintiffs' and Class Members' Sensitive Health Information.**

92.    Defendants ***never*** informed Plaintiffs or Class Members that it was sharing their personally identifiable Sensitive Health Information with third parties, including the Tracking Tool Providers.

93.    By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendants breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

94.    Despite never telling users like Plaintiffs and Class Members, Defendants allowed third parties such as the Tracking Tool Providers to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

**ii.    The Tracking Tools Used by Defendants Were Imperceptible to Plaintiffs and Class Members**

95.    The Tracking Tools installed on the Pharmaceutical Websites were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Pharmaceutical Websites through examination of its source code or the use of sophisticated web developer tools, there was no way for a Pharmaceutical Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Pharmaceutical Websites.

CLASS ACTION COMPLAINT

96.     Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

97.     Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

98.     Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Pharmaceutical Websites, or that their Sensitive Health Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendants' conduct.

**C.  DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES**

**i.    Defendants Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information**

99.     As explained, *supra*, users of the Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on their website.

100.    Upon information and belief, Defendants, as users of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers' to collect Plaintiffs' and Class Members' Sensitive Health Information.

**ii.   Plaintiffs' and Class Members' Data Had Financial Value**

101.    Moreover, Plaintiffs' and Class Members' Sensitive Health Information have value and Defendants' disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

102.    According to Facebook's annual report, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per

year."[45]

103.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

104.    Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[46] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[47]

105.    Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

106.    The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

### D.  DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES HIPAA

#### i.  The HIPAA Privacy Rule

107.    The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers

---

[45] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Dec. 2, 2025).

[46] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[47] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

must safeguard and protect Private Information.[48]

108.    The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by covered entities.

109.    These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google or Facebook account) to identify a single individual.[49]

### ii.    Defendants Collected IIHI from Plaintiffs' and Class Members' and Transmitted it to Unauthorized Third Parties

110.    The Sensitive Health Information that Defendants disclosed to unauthorized third-parties through the Tracking Tools—including the drugs Plaintiffs and Class Members are prescribed, the means by which they pay for these prescriptions, their specific medical conditions, and their patient statuses—is undoubtedly IIHI.

111.    Under HIPAA, IIHI is any information that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. Plaintiffs' and Class Members' Sensitive Health Information, which includes both their

---

[48] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html  (last visited Mar. 7, 2025).

[49]    *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

1  specific medical conditions and specific prescription drugs taken to treat those medical conditions,

2  is squarely within the ambit of this definition.

3      112.   Moreover, the Department of Health and Human Services ("HHS") has explicitly

4  advised that "a pharmaceutical manufacturer that provides support and guidance to doctors and

5  patients regarding the proper use of their products is providing 'health care'" under the meaning of

6  HIPAA and is thus a covered entity.[50] Indeed, on its Website, Mayne explicitly states that it

7  "adheres to applicable privacy laws and regulations including the Health Insurance Portability and

8  Accountability Act of 1996 (HIPAA)[.]"[51]

9      113.   Defendants provided health care to Plaintiffs and Class Members in connection with

10  the Pharmaceutical Websites. For example, through the Pharmaceutical Websites, Defendants:

11     a) Provided Plaintiffs and Class Members with detailed information on how to properly administer and calculate the dosages of Plaintiffs' and Class Members' prescription drugs;

13     b) Granted Plaintiffs and Class Members with accounts to access personalized "***Patient*** Portals" that host extensive medical information and individualized prescription trackers;

15     c) Made healthcare providers available to Plaintiffs and Class Members to serve as resources for Plaintiffs' and Class Members with regards to their prescriptions;

16     d) Repeatedly and ubiquitously referred to Plaintiffs and Class Members as their "patients"; and

18     e) Collected and stored medical information from Plaintiffs and Class Members, including the drugs that Plaintiffs' and Class Members' are prescribed, the type of health insurance that Plaintiffs' and Class Members' hold, and the medical conditions that Plaintiffs' and Class Members' have been diagnosed with, and additionally required Plaintiffs and Class Members to affirm that this information was accurate and identical to information provided to their treating physicians and health insurance providers.

22     **iii.**   **Defendants' Use of the Tracking Tools Violates HIPAA**

23      114.   While healthcare entities regulated under HIPAA may use third-party tracking tools,

24  such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data

25  key to operations.

[50] *Response to Comments Received – General Provisions: Definitions - Covered Entity*, 65 FR 82569 (2000).
[51] *Privacy Notice*, Mayne, https://www.maynepharma.com/privacy-policy/ (last accessed Dec. 10, 2025).

115.    Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendants are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

116.    Lest there be any doubt of the illegal nature of Defendants' practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

117.    Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[52]

118.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[53]

119.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

120.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

121.    Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the

---

[52]    *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS. *available online at*:
https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.
[53]    HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

CLASS ACTION COMPLAINT

information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

122. The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

123. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[54]

124. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on

---

[54]    *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html  (last visited Mar. 7, 2025).

the list."[55]

125.    Here, Defendants provided patient information to third parties in violation of the Privacy Rule.

126.    HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

127.    Defendants further failed to comply with other HIPAA safeguard regulations as follows:

a)  Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b)  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c)  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d)  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e)  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f)  Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g)  Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably

---

[55]    *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html  (last visited Mar. 7, 2025).

safeguard PHI in violation of 45 C.F.R. § 164.530(c).

**E.  DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES STATE CONSUMER PRIVACY LAWS**

128.    In addition to HIPAA, Defendants also violated the various state consumer privacy laws, including the Connecticut Data Privacy Act ("CTDPA") and the Texas Data Privacy and Security Act ("TDPSA").

129.    Numerous states have enacted comprehensive data privacy statutes that regulate some of the data collected by Defendants through the Pharmaceutical Websites.

130.    Under these data privacy statutes, website operators like Defendants are required to:

    a.  limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which such data is processed, as disclosed to the consumer;

    b.  not process personal data for purposes that are neither reasonably necessary to, nor compatible with, the purposes for which such personal data is processed, as disclosed to the consumer, unless the controller obtains the consumer's consent;[…]

    c.  not process sensitive data concerning a consumer without first obtaining the consumer's consent, or, in the case of the processing of personal data concerning a known child, without processing such data in accordance with COPPA;

    d.  […and] specify the express purposes for which personal data are processed.

2022 Ct. P.A. 15 § 6; Tex. Bus.  Com. Code Ann. § 541.101.

131.    Additionally, entities like Defendants are to "not conduct processing that presents a heightened risk of harm to a consumer" without conducting and documenting a data protection assessment of each of its processing activities that involve personal data acquired that present a heightened risk of harm to a consumer." 2022 Ct. P.A. 15 § 8; Tex. Bus. Com. Code Ann. § 541.105(5). A "heightened risk" includes:

    (1) the processing personal data for the purposes of targeted advertising;

    (2) the sale of personal data;

    (3) the processing of personal data for the purposes of profiling, where such profiling presents a reasonably foreseeable risk of (A) unfair or deceptive

45

treatment of, or unlawful disparate impact on, consumers, (B) financial, physical or reputational injury to consumers, (C) a physical or other intrusion upon the solitude or seclusion, or the private affairs or concerns, of consumers, where such intrusion would be offensive to a reasonable person, or (D) other substantial injury to consumers; and

(4) the processing of sensitive data.

2022 Ct. P.A. 15 § 8.

132.    Moreover, under these statutes, consent means:

[A] clear affirmative act signifying a consumer's freely given, specific, informed and unambiguous agreement to allow the processing of personal data relating to the consumer.

2022 Ct. P.A. 15 § 1(6); Tex. Bus. Com. Code Ann. § 541.001(6).

133.    The CTDPA and TDPSA further specify that:

"Consent" may include a written statement, including by electronic means, or any other unambiguous affirmative action. Consent shall not include: (A) acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; (B) hovering over, muting, pausing, or closing a given piece of content; or (C) agreement obtained through the use of dark patterns.

*Id.*

134.    Defendants' use of the Tracking Tools described in this Complaint violated these state data privacy protection statutes.

**F.  PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

135.    At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

136.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

137.    For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[56]

138.    Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[57] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[58]

139.    Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

## V.    TOLLING AND ESTOPPEL

140.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation of the Tracking Tools onto the Pharmaceutical Websites.

141.    The Tracking Tools on the Pharmaceutical Websites were and are invisible to the average website visitor.

142.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

143.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

---

[56] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Dec. 2, 2025).

[57] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[58] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

144.    Defendants had exclusive knowledge that the Pharmaceutical Websites incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiffs and Class Members, that by obtaining information and/or applying for Savings Cards through the Pharmaceutical Websites, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including the Tracking Tool Providers.

145.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of their patients' Sensitive Health Information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

146.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

147.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## VI.    CLASS ALLEGATIONS

148.    This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

149.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used a Pharmaceutical Website to request a Savings Card, and whose Sensitive Health Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party.

150.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate Connecticut and Florida Subclasses, which are defined as follows:

CLASS ACTION COMPLAINT

**Connecticut Subclass**

All natural persons residing in the State of Connecticut who used a Pharmaceutical Website to apply for a Savings Card, and whose Sensitive Health Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party.

**Florida Subclass**

All natural persons residing in the State of Florida who used a Pharmaceutical Website to apply for a Savings Card, and whose Sensitive Health Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party.

151.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

152.    Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

153.    **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

154.    **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)      Whether and to what extent Defendants had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b)      Whether Defendants had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c)      Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

d)  Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Health Information was being disclosed without their consent;

e)  Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f)  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g)  Whether Defendants violated the statutes asserted as claims in this Complaint;

h)  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i)  Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j)  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Sensitive Health Information.

155. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools. Each Plaintiff is typical of, and represents, a subclass of Website users residing in their respective home states whose Sensitive Health Information was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

156. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

157. **Predominance.** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully

stored and disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

158. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

159. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

160. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a)    Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

      b)    Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

      c)    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d)     Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e)     Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f)     Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

161.    Finally, all members of the proposed Class are readily ascertainable. Defendants and/or the Tracking Tool Providers have access to Class Members' names and other identifying information provided to Defendants through the Pharmaceutical Websites.

**COUNT I**
**COMMON LAW INVASION OF PRIVACY**
*(On Behalf of Plaintiffs and the Nationwide Class or,*
*alternatively, the Connecticut and Florida Subclasses)*

162.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 161 as if fully set forth herein.

163.    Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

164.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Pharmaceutical Websites and the communications platforms and services therein.

165.    Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

166.    Defendants' interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class

CLASS ACTION COMPLAINT

1    Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

2    167.    Plaintiffs and Class Members have a general expectation that their communications

3    regarding sensitive, highly personal information would be protected from surreptitious disclosure to

4    third parties.

5    168.    Defendants' disclosure and publicization of Plaintiffs' and Class Members' Sensitive

6    Health Information coupled with individually identifying information is highly offensive to the

7    reasonable person.

8    169.    As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm

9    and injury including, but not limited to, an invasion of their privacy rights.

10    170.    Plaintiffs and Class Members have been damaged as a direct and proximate result of

11    Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

12    171.    Plaintiffs and Class Members seek appropriate relief for that injury including, but not

13    limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to

14    their privacy interests as a result of the intrusions upon their privacy.

15    172.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the

16    malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and

17    Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants

18    from engaging in such conduct in the future.

19    173.    Plaintiffs also seek such other relief as the Court may deem just and proper.

20                                **COUNT II**
                              **BREACH OF CONFIDENCE**
21                    ***(On Behalf of Plaintiffs and the Nationwide Class or,***
                    ***alternatively, the Connecticut and Florida Subclasses)***
22

23    174.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 173

24    as if fully set forth herein.

25    175.    Medical providers have a duty to their patients, potential patients, and former

26    patients to keep non-public medical information completely confidential.

27    176.    Plaintiffs and Class Members had reasonable expectations of privacy in their

28    communications exchanged with Defendants, including communications exchanged on the

---

53

Pharmaceutical Websites.

177.    Contrary to its duties as medical providers and its express promises of confidentiality, Defendants deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendants to third parties, including the Tracking Tool Providers.

178.    Defendants' disclosures of Plaintiffs' and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

179.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

180.    As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendants' breach in that:

a)    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b)    Defendants eroded the essential confidential nature of the provider-patient relationship;

c)    Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

d)    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

e)    Defendants' actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information, and

f)    Defendants' actions violated the property rights Plaintiffs and Class Members have in their Sensitive Health Information.

181.    Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

CLASS ACTION COMPLAINT

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
*(On Behalf of Plaintiffs and the Nationwide Class or,*
*alternatively, the Connecticut and Florida Subclasses)*

182.   Plaintiffs repeat the allegations contained in paragraphs 1 through 181 as if fully set forth herein.

183.   Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendants and Plaintiffs.

184.   In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became guardians of Plaintiffs' and Class Members' Sensitive Health Information, Defendants became fiduciaries by their undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Sensitive Health Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

185.   Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with their patients and former patients, in particular, to keep secure their Sensitive Health Information private.

186.   Defendants breached their fiduciary duties to Plaintiffs and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

187.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**
**NEGLIGENCE**
*(On Behalf of Plaintiffs and the Nationwide Class or,*
*alternatively, the Connecticut and Florida Subclasses)*

188.    Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 187 as if fully set forth herein.

189.    Through their use of the Pharmaceutical Websites, Plaintiffs and Class Members provided Defendants with their Sensitive Health Information, believing such Information would be kept confidential.

190.    By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

191.    Defendants negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

192.    Defendants further negligently omitted to inform Plaintiffs and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

193.    Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendants had they known that Defendants intended to use that Information for unlawful purposes.

194.    Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

195.    Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

196.    Defendants' negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits

1  of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all
2  Class Members.

3
                                        **COUNT V**
4                          **BREACH OF IMPLIED CONTRACT**
                    *(On Behalf of Plaintiffs and the Nationwide Class or,*
5                    *alternatively, the Connecticut and Florida Subclasses)*

6          197.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 196
7  as if fully set forth herein.

8          198.   When Plaintiffs and Class Members provided their Sensitive Health Information to
9  Defendants in exchange for medical services, they entered into an implied contract pursuant to
10  which Defendants agreed to safeguard and not disclose the Sensitive Health Information without
11  consent.

12         199.   Plaintiffs and Class Members accepted Defendants' offers and provided their
13  Sensitive Health Information to Defendants.

14         200.   Plaintiffs and Class Members would not have entrusted Defendants with their
15  Sensitive Health Information in the absence of an implied contract between them and Defendants
16  obligating Defendants to not disclose Sensitive Health Information without consent.

17         201.   Defendants breached these implied contracts by disclosing Plaintiffs' and Class
18  Members' Sensitive Health Information to third parties like the Tracking Tool Providers.

19         202.   As a direct and proximate result of Defendants' breaches of these implied contracts,
20  Plaintiffs and Class Members sustained damages as alleged herein.

21         203.   Plaintiffs and Class Members would not have used Defendants' services, or would
22  have paid substantially less for those services, had they known their Sensitive Health Information
23  would be disclosed.

24         204.   Plaintiffs and Class Members are entitled to compensatory, consequential, and/or
25  nominal damages as a result of Defendants' breaches of implied contract.

26

27

28

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT VI**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiffs and the Nationwide Class or,*
*alternatively, the Connecticut and Florida Subclasses)*

205.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 204 as if fully set forth herein.

206.    Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

207.    Plaintiffs and Class Members conferred a monetary benefit on Defendants in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendants which Defendants then utilized for marketing and advertising purposes, as described, *supra*.

208.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

209.    In particular, Defendants enriched themselves by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

210.    Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

211.    Under the principles of equity and good conscience, Defendants should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

212.    If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendants.

213.    Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual

58

1    has not suffered a corresponding loss in the form of direct money damages.

2        214.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class

3    Members have suffered and will continue to suffer injury.

4        215.    Defendants should be compelled to disgorge into a common fund or constructive

5    trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from

6    them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

7

**COUNT VII**
8    **VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"),**
**18 U.S.C. § 2511(1), _et seq._**
9    **Unauthorized Interception, Use, and Disclosure**
_**(On Behalf of Plaintiffs and the Nationwide Class or,**_
10   _**alternatively, the Connecticut and Florida Subclasses)**_

11       216.    Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through

12   215 as if fully set forth herein.

13       217.    The ECPA protects both sending and receipt of communications.

14       218.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

15   electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

16   119.

17       219.    The transmissions of Plaintiffs' Sensitive Health Information to the Pharmaceutical

18   Websites qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

19       220.    <u>Electronic Communications</u>. The transmission of Sensitive Health Information

20   between Plaintiffs and Class Members and the Pharmaceutical Websites with which they chose to

21   exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of

22   [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or

23   photooptical system that affects interstate commerce" and are therefore "electronic

24   communications" within the meaning of 18 U.S.C. § 2510(2).

25       221.    <u>Content</u>. The ECPA defines content, when used with respect to electronic

26   communications, to "include[] any information concerning the substance, purport, or meaning of

27   that communication." 18 U.S.C. § 2510(8) (emphasis added).

28       222.    <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of

any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

223.    <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a)    Plaintiffs' and Class Members' browsers;

b)    Plaintiffs' and Class Members' computing devices;

c)    Defendants' web-servers; and

d)    The Pixel code deployed by Defendants to effectuate the sending and acquisition of patient communications.

224.    By utilizing and embedding the Pixels on the Pharmaceutical Websites, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

225.    Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as the Tracking Tool Providers.

226.    Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including their prescription statuses and medical conditions.

227.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

228.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18

U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

229.  Unauthorized Purpose. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

230.  The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

231.  Defendants are not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class.  However, even assuming Defendants are a party, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

232.  Defendants' acquisition of sensitive communications that were used and disclosed to the Tracking Tool Providers was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

> a)  Invasion of privacy;
>
> b)  Breach of confidence;
>
> c)  Breach of fiduciary duty;
>
> d)  Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3);
>
> e)  Violations of the Connecticut Data Privacy Act, 2022 Ct. P.A. 15; and
>
> f)  Violations of the Texas Data Privacy and Security Act, Tex. Bus. & Com. Code Ann. § 541.001, *et seq.*

233.  Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Pharmaceutical Websites, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with the Tracking Tool Providers and other third-parties that (a) did not participate in these

communications, (b) Plaintiffs and Class Members did not know were receiving their Sensitive

Health Information, and (c) Plaintiffs and Class Members did not consent to receive their Sensitive

Health Information.

234.    As such, Defendants cannot viably claim any exception to ECPA liability.

235.    Plaintiffs and Class Members have suffered damages as a direct and proximate result

of Defendants' invasion of privacy in that:

a)    Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b)    Defendants received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c)    Defendants received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Pharmaceutical Websites and determining what ads people see on the Pharmaceutical Websites, without providing any value or benefit to Plaintiffs or Class Members;

d)    Defendants failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e)    The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendants making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

236.    Defendants intentionally used the wire or electronic communications to increase its

profit margins. Defendants specifically used the Tracking Tools to track and utilize Plaintiffs' and

Class Members' Sensitive Health Information for financial gain.

237.    Defendants were not acting under color of law to intercept Plaintiffs' and Class

Members' wire or electronic communication.

238.    Plaintiffs and Class Members did not authorize Defendants to acquire the content of

their communications for purposes of invading their privacy via the Pixels.

239.    Any purported consent that Defendants may claim to have received from Plaintiffs

1   and Class Members was not valid.

2       240.   In sending and acquiring the content of Plaintiffs' and Class Members'

3   communications relating to their use of the Pharmaceutical Websites, Defendants' purpose was

4   tortious, criminal, and designed to violate federal and state legal provisions including a knowing

5   intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable

6   person.

7       241.   As a result of Defendants' violation of the ECPA, Plaintiffs and the Class are entitled

8   to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the

9   greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief,

10  compensatory and punitive damages, and attorney's fees and costs.

11                          **PRAYER FOR RELIEF**

12      **WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for

13  judgment against Defendants as follows:

14      A.    an Order certifying the Nationwide Class, and Connecticut and Florida

15            Subclasses, and appointing the Plaintiffs and their Counsel to represent the

16            Classes;

17      B.    equitable relief enjoining Defendants from engaging in the wrongful

18            conduct complained of herein pertaining to the misuse and/or disclosure of

19            the Sensitive Health Information of Plaintiffs and Class Members;

20      C.    injunctive relief requested by Plaintiffs, including, but not limited to,

21            injunctive and other equitable relief as is necessary to protect the interests

22            of Plaintiffs and Class Members;

23      D.    an award of all damages available at equity or law, including, but not

24            limited to, actual, consequential, punitive, statutory and nominal damages,

25            as allowed by law in an amount to be determined;

26      E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

27      F.    prejudgment interest on all amounts awarded and

28      G.    all such other and further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

DATED this 24th day of December 2025.

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: _/s/ Mona Amini_
Mona Amini, Esq.
6940 S. Cimarron Road, Suite 210
Las Vegas, Nevada 89113
Telephone: (800) 400-6808
Email: mona@kazlg.com

Tyler J. Bean *
Sonjay C. Singh *
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Telephone: (212) 532-1091
Email: tbean@sirillp.com
Email: ssingh@sirillp.com

*pro hac vice admission anticipated*

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT